The first case today is number 161322 U.S. v. Tanco-Baez, number 161323 U.S. v. Cepeda-Martinez, and number 161563 U.S. v. Peter Rosario Serrano. Good morning, your honors. Ellie Maranzini, assistant federal public defender on behalf of appellant Jose Cepeda-Martinez. With the court's permission, I'd like to reserve one minute for rebuttal. Before we do that, we're going to switch your time to five minutes, because the denial of your motion the other day was based on a representation that the parties had split the time to five minutes. So, Dan, please change that to five minutes. But you need to understand that I'm not one for sticking. You'll have time to make your arguments, so don't worry about that. So you want how many minutes in reserve? One minute, your honor. Okay. Thank you. And I'd like to say I've gone blind, nearly blind, in service to my country. Attorney Liza Rebar. I'm here, your honor. So you have five minutes, not three minutes. Okay. Here we go. May it please the court. Your honor, Mr. Cepeda's conviction on count one should be reversed because the evidence was insufficient to sustain that he was a drug user in possession of a firearm as required by the statute. Essentially, Mr. Cepeda was convicted based on two words of testimony, a long time, that he had been using drugs for a long time. Everyone in the trial agreed that those words were essential to the conviction. Everyone agreed that there was ambiguity about what those words meant. And the testimony as to those words was originally presented in Spanish, and then there was a lengthy debate about how those Spanish words should be translated into English for purposes of the record. There were two things missing from the evidence regarding the drug user element that are both fatal to, either one is fatal to the conviction on that count. First is that there was no independent corroboration of Mr. Cepeda's confession regarding his drug use. And second, there was a complete dearth of evidence regarding the length of time for which he had been a drug user. When you say there was no corroboration for drug use, I think you've got to break that down, don't you? There certainly was corroboration that he was using drugs. They found drugs on him.  So I think you're forced to narrow your argument to say there was no corroboration for the durational component of the charge, the long time. Yes, that's right. There was no corroboration either as to the frequency of use or the duration of use. But even as to the contemporaneous use, whether he had been intending to use on that same day, the possession of marijuana wasn't accompanied by any, let's say, rolling papers or lighters or any other paraphernalia that would have corroborated his intention to actually use on that day. And as the Fourth Circuit held in Sperling, which in that case involved a canine alerting to the individual's car, they noted that that might corroborate a confession as to possession of controlled substances but not as to use. How big was the quantity in the car in the Fourth Circuit case? There was no drugs found in the car in the Fourth Circuit case. The canine alerted aggressively to two portions of the car and the court found that you could infer that there had at some recent time been controlled substances in the car, but there was nothing actually seized. Right, but if someone's picked up in a drug operation, a drug sale, a drug transaction, the presence of drugs doesn't tell you quite as much about their personal use because they could be possessing the drugs in order to conduct the transaction. Here, as I understand it, he was not engaged in a drug transaction. He was out in some hit on trying to kill someone and he saw fit among the few things that he brought with him to bring a small bag of marijuana containing enough for two joints. That sounds like pretty good corroboration that at least as of that time he was a user, leaving you to argue, well, how long or is there corroboration for the long time? That's right, Your Honor, and the two issues that we raise with regards to this efficiency are interrelated and both of them hinge on both frequency and longevity of use. Didn't he represent that he was for a long time a near daily user? The testimony was that he stated to the agent that he was a daily user and the agent was asked if he indicated how long he had been using and the answer was for a long time, but the testimony was not that he had been daily using for a long time. I get that, but I'm just wondering when we think about corroboration, I understand the argument is it has to be corroboration of the essential fact and you're claiming duration is the essential fact, but the gap that maybe you can help me with, and maybe it's just your fourth circuit case you think is the key case and we should just do what they did there, but what corroborates, what could be corroboration of the essential fact? Circumstantial evidence can corroborate it, and here it's not just that he possessed, but since his statement is I was a daily user and that just random day we pick you up, you have it that day too, that tends to corroborate your representation that you're a daily user. It doesn't get you all the way to how long were you a daily user, but just the concept of being a daily user does imply duration, so what do you say to that? I see that my time is nearly up, may I respond to your question? Yeah. Other cases that have held evidence to be sufficient either for the guideline enhancement for a drug user or for conviction under 922G3 have considered evidence including a drug test, a blood test, a urine test around the time of the offense, testimony from witnesses, family or friends regarding the individual's drug use, records from inpatient drug abuse treatment, a history of arrest for possession of controlled substances, in addition to a defendant's statement in order to find that either there was sufficient corroboration or just sufficient evidence regarding the elements of the offense, and here there was a complete absence of anything other than an unrecorded, unmemorialized, unwitnessed other than by one agent's defendant's statement, and that statement wasn't corroborated by anything other than the fact that the marijuana was found in the shoe, and to make matters worse is that the testimony regarding what the defendant allegedly said to the agent was completely ambiguous and speculative in terms of how long he had been using. All of those errors are compounded by the fact that the statement was obviously not memorialized, but this is a key case I think for why the corroboration requirement is important, so that we're not sending evidence to the jury that is completely ambiguous and speculative. You're not making an argument, are you, that the statement that he had used for a long time, that part of the ambiguity is that it could have meant that he used it for a long time that day? You're not making that argument, are you? It could have meant that, but the problem, and this is highlighted by, there are multiple pages of the transcript. But how would you square that interpretation with the acknowledgement that he was a daily user? I'm not sure I understand Your Honor's question. Does he say that he was a daily user? Yes. And that he used for a long time, so if you just took the second statement by itself, there's a lot of ambiguity, and one possible meaning is, I used drugs for a long time today. Right. But how do you square that with the other statement that he acknowledges that he was a daily user? I think that it could be interpreted either of the two ways that Your Honor has just mentioned. And in fact, I think before closing arguments, the judge instructed the jury that a synonym for how the testimony came out, which was a long time, could also be a while. That he had used it for a while or a while ago. So all of that debate regarding the meaning of those two words, which in Spanish are hacia tiempo, underscore the need for corroboration. Why? In other words, I guess I'm just not fully grasping the point about the ambiguity, as opposed to the fact that the state, the idea that somehow the corroboration is going to clarify an ambiguous statement. I thought the point of the doctrine that makes the uncorroborated confession problematic is that we're just skeptical about the reliability of the confession. That's right. Not that we need it to clarify the confession. Your Honor's right, and I think that the lack of corroboration in and of itself is a basis for reversing the conviction. But additionally, as to our second argument, which is that there was insufficient evidence regarding the length of use. If there had been corroboration, so the two issues go hand in hand. Because if there had been some form of corroboration, we wouldn't be asking the jury to infer from two ambiguous words how long the person had been. The doctrine says that the uncorroborated, unmemorialized confession is what's problematic. Suppose this had been on video. It would still need to be corroborated because of the risk of false confessions. Okay. I understand why you would be attacking the 922G conviction. But for sentencing purposes, even if that conviction is set aside, it seemed to me that the judge crafted the sentence based on the murder evidence and the possession, but not the user part of it. That the sentence is fully justified. In fact, I don't think the judge even mentioned the user conviction, the 922G conviction. Is that how you see it as well? That your request for remand for resentencing hinges in part on the murder evidence, does it not? Yes, Your Honor. Okay. But we would contend that if the court would only grant us relief as to count one, which would be vacating that conviction, that remand would still be warranted for two reasons. One, because he would only be convicted then of one count instead of two. And second, the guideline range would arguably be lower. There would be the possibility to have a two-level reduction in the base offense level, lowering the guideline range, which would mean that if the court was inclined to impose the maximum sentence, his justification for that variance would need to be greater. But what in the record suggests that without the count one conviction, the sentence would be any different? All the judge talked about was the count three conviction and the murder evidence. Just the fact that the guideline range would be different, requiring a greater justification. Was the sentence purported to be for both counts? Yes, Your Honor. So is it just, do we have any case law regarding whether if a sentence purports to be on two counts, you just have to remand if one of the counts is flipped? Not that I'm aware of, but if Your Honor would like, I could look into it and submit a Rule 28J letter. Our position on that front is simply that because the guideline range would be different, there would be a different procedural process. And the court has held that that variance would have to be justified more substantially. Because this was at the maximum of the guideline range that would apply if it was both counts? This was over two times the high end of the guideline range that applied to both counts as groups. If Mr. Cepeda were only facing sentencing for count three, his base offense level would be two levels lower because of the user issue, the drug user issue. And so the guideline range would be even lower. Does the PSR show that the sentence was based on a base offense level? Two levels higher than it would be if we reversed all of the counts? No, Your Honor. But the problem is that the PSR in this case was never ordered to be amended after sentence. And at the sentencing hearing, when the court heard objections to the base offense level, which in the PSR was at the stat max because they applied the cross-reference for murder, the court held that he was not going to apply that cross-reference, and he held that the guideline range was, I think, 41 to 51 months. But the PSR in this case was never amended to reflect that. But he then went to the statutory maximum, which would apply for count three. Isn't that what happened? Correct. Okay. But there's a chance that the guideline range would be lower for count three. But he identified a guideline range that you say would not be the range if we flipped one of the things. Correct. So that would be the predicate from the record for saying that the presence of both counts influenced the sentence? Yes, Your Honor. Because the drug user definition is also incorporated into the guideline range. Thank you. Thank you, Your Honor. Good morning, Your Honors. My client is Juan Tancováez, and my name is Lidia Aliza-River. In this case, Your Honor, Tancováez was charged in counts two and three. Issue here is did he have weapons, possession of weapons. As to count two, he was a felon, so the only issue as to that count was did he have weapons at that time. Count three is the issue of guns, of machine guns. Did he know that it had been changed to be able to fire many shots instead of one? From a trial, Your Honor, at least we find that there is no evidence to show that he had actual possession of any gun. In fact... Well, what do you do? There are three assailants. He's one of the three. They're driving two cars. One's the escape car, one's the hit car. He's in the hit car. And three guns are then found at the scene afterwards. Couldn't a jury reason this fellow is highly unlikely to go to a premeditated highway shootout without a gun? And that's corroborated by the fact they find three guns with three guys. Is that enough to then say he must have had a gun? I would say no, because we know that one of those guns was in the hands of someone else. Someone else who said, this is my gun, I have it. Sure, okay, one guy, one gun. So now you've got two guys and two guns. The other guns were found in the Jeep, my client did not ride first in that car. No, but after the shooting he went to the Jeep Cherokee. Well, he did flee, but he had no guns in his hands. No one saw him carrying guns at any time, either from the rake car, either from the Jeep. When he ran out of the Jeep, he did not have any weapons in his hands. When you say he did not have any weapons, are you saying there was witness testimony that someone saw him and he was not carrying a gun? Or are you simply saying that none of the witnesses pointed to a second figure as having a gun? Both. So who testified that they saw him and he didn't have a gun? Torres. Sergeant Torres, at the sentence, he sat in court and he stated that Tanco Baez did not have guns, neither did he use them, that he could see or he had learned about that. And besides that, there was no proof that at any time he had guns with him, nor in his car, which is the rake car. I don't recall him saying that he saw your client during the shooting. I'm sorry? I don't recall him saying that he saw your client during the shooting. I don't recall him saying he didn't see the whole event, but he didn't see your client with a gun. No, he said that Tanco Baez did not have any weapons. He did not have any guns at the sentencing hearing, nor did he find evidence that he had used one all that time. Remember that two guns were left besides the rake car, the jeep, and one other gun was found in pieces in the apartment. Tanco was there, but he was not there alone. And when he went over there, when he ran over, he had nothing in his hands. He had no weapons with him, and that is what was seen by agents who were there at that time. So a possession became the issue, whether he had any interest, control, what did he do to have the firearms. Just so I'm getting it all, could you just run through for me where the three guns were found, each of the three guns? Could you run through for me where the evidence shows the three were found? Were all three found in the jeep? No. One, two were found in the jeep. One was found in the apartment, 46. But we know that one of those guns was one of the other Tanco offenders. As to the third gun that was found in the apartment, did the government argue to the jury that the gun found in the apartment was used in the incident? Yes, yes they did. It matched bullets that were found near the body of the dead guy. If that wasn't a testimony that all three guns were fired? They were fired, all of them in order, but only one apparently killed this man. Right, but we don't know. There were 73 shots fired, and all three of the guns were fired. Correct. So I think your case necessarily presumes that one of the three guys was using two guns. Possibly, Your Honor. Well, not possibly. Definitely. Your case counters on that. The jeep had, in that jeep, they did find bullets, magazines, and all sorts of things related to weapons, firearms. The car that Tanco drove that day had nothing in it that had to do with weapons, firearms, or anything of that kind, Your Honor. So possession, again, became an issue, and there was no evidence that he did anything or said anything to have weapons with him on that day. And that is why I think those two and three should be reversed. What's the evidence linking the other guns to anyone? The other guns to anyone, basically, what they are, Your Honor, one of them admitted having one gun, so that one is out. The other two were found in the jeep. Is that the one found in the jeep or the one found in the apartment? One found in the jeep, because he said that I got out of the jeep and then I threw the gun. The gun. Right, that gun, the machine gun. Why doesn't that hurt you in the sense that it suggests that he didn't have two guns? Because, Your Honor, when Tanco gets into that jeep, he had nothing with him. That jeep must have had the other guns. So the other guns were there already. They were not his guns. As I said, bullets were found there. Other parts were found there. And it had nothing to do with what he had at that time when he ran over to that jeep. We also know, Judge, that from that jeep, someone else fired. And the guy who fired from that jeep was the guy who said that I own this weapon, the machine gun. Because he was dressed in black pants and stripes, and he was the one who was seen getting out of that jeep, firing again, and then going back to that jeep. So, again, Your Honor, possession to me became a big issue at that time. Tanco drove a car that day. That was it. Counsel, can I ask you a couple of questions? Does the record show what model the jeep was, what the jeep looked like? Was it more like an SUV? I don't remember, Your Honor. I thought it was red. So I have this question. Why couldn't a reasonable jury, faced with evidence of a gunfight, and at the tail end of the gunfight, three of the participants are in one vehicle, and there's at least one gun in that vehicle. So what if two of those individuals in the vehicle become incapacitated in some way? Why couldn't a reasonable jury infer that the remaining person would just pick up the gun and use it in self-defense or otherwise? In other words, why can't they say that all three of them had constructive possession of any weapons that were in the vehicle during an ongoing active gunfight? Okay. First of all, that was very, very short of time, and I know time means nothing. But there is no evidence. But is a jury supposed to assume that an individual conditionally placed in that situation wouldn't pick up an available gun and use it, would instead just let himself be shot? Isn't that the definition of constructive possession? Well, yes, but you need something to be done by a type of eyes to get hold of that gun, Your Honor. No, that would be actual possession. Constructive? There has to be something that he did or said, Your Honor. It's not merely being there. He has to do something else besides just being there. In a tightly enclosed space and circumstances that would suggest to it, I'm positing to a reasonable juror that almost any human being would use the weapon as opposed to facing the consequences. But the fact is, Your Honor, that guns are thrown out of that Jeep. It wasn't him. They didn't seem throwing out guns or anything like that. It was someone else. Is there any evidence that would point to the occupants of the Jeep knowing the gun was there? Knowing the gun was there? Well, at least there had to be one or two guns there because in the dash part of that Jeep, they found bullets, magazines, so that Jeep carried parts of something that would be used with a weapon. Well, we know there were three guns in the Jeep. I'm sorry, Your Honor? There were three guns in the Jeep when they drove away. Yes, three guns in the Jeep. With the three guys. But it could be that two of those guns were in that Jeep already and then the other gun was carried in by the guy who was fired. The question is, for the constructive possession, if I enter a Jeep in the middle of a gunfight knowing there's a gun in that Jeep, then there's an argument that I'm not just merely present in a place with a gun, but I'm in a place in which I have constructive possession of the gun given the situation that I'm in and where I put myself. If I enter a Jeep in the middle of a gunfight, I don't know if there's any gun in the Jeep. That's one thing. But if I come into a Jeep knowing it's got a gun in it, then the question Chief Judge Howard asked, he seems to have more force, which is don't I constructively possess any gun that's in there once I go in? I would say, did he have time to get out of it? Because he got in, that Jeep fled, and that was it. When they come back, they are thrown out of that car, the tanker freeze running, he doesn't have anything with him. Did he have time to decide, I don't want to be near guns, firearms, let me get out of here? That is what I would have argued if that had come up in that fashion. Your client is the one that there's some evidence that at one point as he was fleeing, he appeared to be laughing at the police officer. Was there testimony to that? Yes, Your Honor. Okay. Thank you. Good morning, Your Honors. Good morning. I'm Jenny Espada, and I represent Peter Rosario Serrano. Perhaps there would be no need for me to be standing here before you if Mr. Rosario Serrano had been charged with aiding and abetting in murder. Because clearly the big elephant, pink elephant in the room during the trial was the fact that there was a dead human being at some point, and everybody was trying to ignore the fact. Very difficult for the jury to disregard that. It is important to factually divide this case into two different scenes of the crime. The first part, the actual murder that happens underneath a bridge. And, well, perhaps we need to start before, when there was actually a kind of like drag racing between some cars. That's what the first witnesses testified to, that they observed the gray guys and the Jeep was actually a wine-colored Jeep Cherokee. Your Honor wanted to know. So, excuse me, they were kind of drag racing, and then they stopped under the bridge. This is under the bridge is actually where all the shootout happens. Throughout all this, my client, Mr. Rosario Serrano, is the driver of the Jeep. The testimony was that after, when the shooting began, Mr. Serrano was approximately about 100 feet away from the bridge, where the actual shootout happened. There was a testimony of the custodian of the surveillance videos that take constant surveillance of different parts of the highway in Puerto Rico, and he was there to present those videos. In the video, it is depicted that the Jeep, at some point, it seems like it was going to continue, and it wasn't going to stop. So, we were always under the contention that there was a type of attempt to desist. However, he did back up. But the important aim... To be precise, after the shooting and the volley of a large number of shots, and the other two were then fleeing, he put the car in reverse, pulled it back up, stopped so they could get in, and then drove off. Yes, that is correct, Your Honor. But during the shootout, he had driven a substantial distance from the bridge. And this brings me to the fact that Mr. Rosario Serrano is charged with aiding and abetting in the possession of a machine gun. The government made a very strenuous attempt of sitting down a tow truck driver, who was the first person in the scene who had actually observed the vehicles, kind of drag racing amongst them, and he was trying to testify that they were rapid bursts of shots. Clearly, we objected emphatically, because we thought he was not the adequate witness to testify in terms of the automatic weapon. However, it has always been our contention that Mr. Rosario Serrano did not have foreknowledge that that weapon that he was aiding and abetting in was modified to shoot in automatic mode. It seems the prosecution's case hints that they may try to make some argument. We'll hear about premeditation, but it sounds like it heavily hinges on the assumption that someone could hear from the firing that it must be automatic, and then that there was a window of opportunity post-acquisition of that notice for your client to flee and disconnect, and that his failure to do so after he heard the gunfire ties him in. If that is the theory, is there evidence in the record that would allow the jury to distinguish a semi-automatic from an automatic, the sound of one firing? Is a semi-automatic not qualified as a machine gun? No. So what evidence in the record is there that would allow a jury to say that your guy could have told that it was a machine gun by what he heard? There was no evidence, Your Honor. They had to, I think this oral court would call, they inferred, from my standpoint is they speculated that he must have known because it was clear that during the actual shootout he was with the windows closed because that was depicted in the video, and he was a very substantial distance away from where the shootout was happening inside a bridge, which in itself tends to enclose. That's a slightly different argument. That suggests he didn't hear the sound. Yes, because... I understand, but if we thought a jury could conclude he did hear the sound, Judge Catt, his question is focused on is the sound that he heard the kind of sound that would give you notice that it was a machine gun? What evidence is there in the record of that? I don't know if I fully understand the question, so let me try and cut me short so I don't use up your time, but there was no evidence that those gunshots were heard anywhere outside that bridge. There was evidence about the nature of the sound, and the nature of the sound was a sound that is many shots in rapid succession. Rapid fire bursts, yes. So the question then becomes if it was reasonable to conclude, and you may say it wasn't, but if it was reasonable to conclude for a jury that he would have heard that sound, the question arises is that the kind of sound that a jury could reasonably conclude would put him on notice it was a machine gun, as opposed to a different kind of sound that you would think, well, that just sounds like single shots, nobody would think that's a machine gun, but if you hear the sound that's rapid firing, would that be enough to tip you off it was a machine gun? Assuming it was reasonable to conclude you heard it. Well, yes, the answer to that would be yes, but the bottom line is that the evidence points to the fact that he was in quite a substantial distance from where those rapid fire shots were occurring. So you're hinging on an argument that the jury could not have reasonably found that he heard the sounds. Correct, that there was insufficient evidence for the jury to find that he in fact heard the sounds, and it was physical evidence. It was a video depicting a car a very substantial distance from where the shots were happening. And furthermore, there's another issue that I haven't gotten to. Before you get to that, this is an important point. As I understand it, you're saying you're hinging your argument on us ruling, you want us to rule that the jury could not have found that he heard the sounds, and you seem to be conceding in response to Judge Barron's question that if he did hear the sounds, then a jury could find that he knew it was a machine gun. Yes, I have to be honest with the court. I cannot say contrary, but what I'm trying is to make a caveat and a distinction. But at trial, you objected to the lay witness testifying, so you didn't preserve anything about that question about whether the shots that were heard fired might not have been a machine gun? You haven't preserved any argument on that? I don't think I did, Your Honor. Were you trial counsel? Yes, yes I was. And you successfully at trial, I think, got a judge to rule that a lay person couldn't testify that it was a machine gun based on the hearing. Yes, I mean, I'm sorry, I did that, but I'm not sure if I understand. The second part of the question was whether I presented any evidence that my client indeed did not hear those shots. That's the question that I understood. I'm sorry. Let's try to be very precise. I know you can test it, but let's assume, just for the purposes of argument, that we are of the view that a jury could find that your client heard the sounds. Yes. Is that the end of your appeal? Or are you arguing, as you did below, when the government sought to present a lay witness to testify to the conclusion that it was a machine gun, and you argued below that that's not something that a lay witness would necessarily know, are you still pressing that argument that the jury, who are lay witnesses, could not, or rather your client, who is a non-expert presumably, could not tell? Well, our contention was that the lay witness, the tow truck driver, did not have a scientific basis in order to determine that. There was further testimony of an actual forensic expert. And in her testimony, it came out that the firearm was modified in a way that was not visible to the naked eye. She actually had to pry open the firearm in order to see the hidden chip, because it is the chip that actually makes the firearm a regular weapon into a machine gun. So for argument's purposes, he couldn't have seen the chip, which sometimes in some firearms it's a visible piece that extends from beyond where the magazine goes into. So it was an invisible chip. Counsel, I understand that part of the argument. I'm interested in something slightly different, if I can ask. Of course. If we assume that there was sufficient evidence that Rosario heard gunshots, one possibility is that the victim had a Glock or something like that that had 19 single-shot rapid-fire capability and that the other two did as well. So that's 50-something shots that could have been fired in pretty rapid succession and that somebody might have mistaken that for a machine gun. That's all I'm suggesting. Is there any argument along those lines in general that you're making, that's been preserved and that you're making, that what was heard, no one could conclude it was a machine gun? Well, Your Honor, I think I recall at the sidebar during my objection of the tuk-tuk driver's testimony was that it could be firecrackers. I mean, it's not necessarily. Sometimes firecrackers, when they're all tied together, they sound very similar to rapid gunshot bursts. Sorry. And ultimately, Your Honor, had the government charged him with aiding and abetting a regular firearm, perhaps we wouldn't be here either. It's just that particular point where it was aiding and abetting in the possession of a machine gun, which another co-defendant claimed to have been possessing during the time of the shootout. He was a getaway driver and he had the least control over what was happening. And I would have to say he tried to desist and perhaps, you know, he was too young and too stupid not to do it at the right time. Thank you. Thank you, Your Honor. May it please the Court. Thomas Compton on behalf of the United States. If I may, first of all, correct the record. In this case, the sequence of events were the tow truck operator initially thought it was a drag race. But then after seeing the crash, because he followed it thinking he might get some business, stopped. And then in the sequence of events was the Jeep passed, went six feet past the bridge area underneath, stopped. The other car, which was the blue one, which was the victim, I would say, got hit by the gray car, because they had turned around, stopped the car. Then there was a shootout. Then that's where we had the first series of machine gun shots, where the tow truck operator attempted to describe it where he said it was like a BRRR, like a rapid firing. We have also there at that moment, after that happens, he says he saw two people get out, the driver, which by DNA evidence, which was on the steering wheel and on the sixth shift, and a cigarette that was sitting outside of Tanko, getting out of the car, as well as another person. We have two people getting out of the car, running in, getting into the red colored Jeep. What happens is the Jeep sits there, it's my understanding, and all of a sudden Zapata, who was having to be our circumcised, was one of the persons getting out of the gray car, and he admits it. There's testimony saying he had been in the gray car, he had confessed that he had been in the gray car. He got in, and then what does he do? He gets out. In the meantime, as the evidence shows, the Jeep, probably not knowing, circumstantially starts taking off. There's video. If you look at exhibit number 18, video of it showing taking off. Yes, it did go part of the distance. We've already had one round of shots, including the machine gun sound. And we had a witness testify, the officer that happened to be present, 50 feet away, going up a ramp, getting out. What does he hear? He hears a machine gun. He testifies sound of a machine gun going off. Rapid fire, very fast machine gun. What happens is the Jeep goes forward, stops, and then reverses. What do we have? The window is open because we have Tanko. Somebody leaning out the window with a hand, as if coaxing, or we don't know, but it can be inferred, telling Cepeda to get back in because Cepeda had gotten out. This is all circumstantial. Got out, another burst of machine gun. Who knows, maybe knock off the guy, or make sure he's dead. And getting back in the Jeep, the Jeep starts taking off. In Rosamond, they give the example of the foreknowledge. That if I show up, it's hard to withdraw once the gun is visible. If I'm in on the scene, because there's a risk of more gun violence if I withdraw at that moment. Right? Yes. So, could you just help me translate that aspect of Rosamond to this situation? Because as I understand it, what you're positing is, he now knows there's a machine gun, he didn't know that before. It's when he hears the sounds that he knows it. Right? Correct. And then you're thinking the right thing to do at that point is abandon these people he's with, who's got a machine gun. The Rosamond passage that talks about the danger of leaving, making it hard to attribute the foreknowledge just from immediate recognition, all of a sudden there's a gun in the midst of this deal, seems to apply just as strongly here. I would think there's a pretty big risk if you suddenly turn tail, that the machine gun would be trained on you. So is that really foreknowledge within the meaning of Rosamond? I would think, because if you think, your theory is saying turning tail and shooting at you afterwards, well, he could have just left and would have been away from the crime scene. Instead, what does he do? He backs up, realizing, oh my God, the guy got in the car once with the machine gun, and then what does he do? He gets out a second time, you know, got in once, gets out and gets in a second time. When is it precisely you're saying that the driver of the Jeep should have fled the scene? I would say after hearing the first round of series of shots, knowing, oh gosh, this guy has a machine gun. I mean, you have to also look at the sequence of events. This looks like a pre-planned hit, so you know firearms would be used. That's just a different argument, though. Just stick on this argument. And on this one, that is predicated on the jury being able to decide that what he heard was a machine gun. That is correct. This is the part I'm not quite sure what we're supposed to do after Rosamond. If he hears it's a machine gun, he now has that knowledge, so that's the first way he acquired it. Right. It's not like he's a stranger who hears it's a machine gun and decides to participate. He's already in it. Right. So he started to leave. What? He started to leave. He actually started to leave. What does he do? He comes back for the guy. It wasn't like he just sat there and waited for the guy. He actually left and then came back. I think there's a distinction there. But now, you've changed it. The coming back is the second time, right? Correct. All right, but you want us to focus on the first time. Well, I think you have to look at both circumstances. The second time, he's got another guy in the car who may well have a gun with him. That is correct. So the fleeing option doesn't look so great there. But the other guy is leaning out the window, so you can see he's just hanging out the window trying to get the guy to come back in. Well, you want us to find the other guy had a gun. That is correct. So you want him to flee when one of the co-conspirators is sitting in the car with him with a gun. I think Rosamond is going to close that door for you, which is why I thought you said he should leave after the first volley. Yes, he should have after actually the first volley. The case is dependent on exiting at that point, not what he did thereafter. Because once Tonko gets in the car with him, fleeing under Rosamond's definition of exiting, I don't think, becomes an option. Well, I respect him disagreeing because he could have opted out and said no, or he could have not even picked up Tonko actually in the first place, too, like we were saying. But now you're back to the first one. Right, that is correct. So on the first one, can you just listen? What is the scene as to the first? The moment he acquires knowledge, on your view, of the machine gun at that first instance, he's alone in his car? Yes. And where is he relative to everybody else? He's just right in front. If you have a bridge right there, he's like 20 feet away from the scene of the crime. That is what the witness testified, the tow truck operator said. He was 20 feet. He was just 5 feet past or 6 feet past the bridge itself. So you have the accent. If you look at the exhibits. And he's the getaway. He's supposed to be the getaway. The getaway car, exactly, the understanding. And that's the way it is proven at trial because he's waiting for him. And your position is the risk to him of leaving in the getaway car at that point and being shot at by the machine gun is not so great that under Rosamond, we should treat him as not having a chance to leave. Exactly. What do you do? Your expert said there were two volleys that he heard. Round one, round two. Correct. Round one was not a machine gun. Round two was a machine gun, he testified. So where do you place that in the sequence of when the driver of the Jeep should have fled? My understanding was the expert didn't testify as to when. The expert said he had gotten out of the car. He said what he first heard was rapid fire but not a machine gun. My understanding was he was just parking when he had gotten out. And that's when it was the second round that he heard the rapid machine firing at him. It was the first witness who testified as to the rapid. The first witness, which was a tow truck operator, who testified as to the rapid machine gun in the first round. But you put an expert on who said there was a round that he heard first that was not a machine gun, I believe, if I got that right. He heard rounds but he didn't describe. Actually, at this point I do not recall. I do recall that it was the tow truck operator who testified as to the rapid, like I said, for Burr. Then the other car stopped, the police officer stopped, and he had heard some shots. And then he said he had seen somebody. What he had heard was the second rounds. That's my understanding from the record. So then you have no testimony by your expert that what was fired before the first round was machine gun fire. And yet your exit theory depends on fleeing after the first. But we have a witness who testified that the Burr of the sound of itself was as if it was rapid fire. And the jury logically could understand what it was. How do you distinguish that from a semi-automatic? Would I know if I went to a firing range today and I had my eyes closed? Could I tell the difference between a semi-automatic and an automatic? I think you could because I've heard them before. What evidence in the record tells me what I would be listening for to tell the difference? I think the logic from the jury itself in hearing either the distinction between 1, 2, 3, 4, 5 versus Burr, like the witness testified, the tow truck operator, and a rapid succession. It can't be because you can see there is at least some semi-automatic fire that's not enough to qualify as machine gun fire, correct? That is correct. And we have a witness who testifies only to there being, in the first circumstance, rapid fire. And then a second because there was another example. The first scenario is rapid fire, right? That I recall, yes. So if a jury hears somebody say, I heard rapid fire, on what possible basis could the jury know that that was the kind of rapid fire that was machine gun rather than semi-automatic fire? There's no way that could be true. I think just from the intonation of what the witness had testified in this case as to how the sound came out. But no one testified to the jury about the sound that he described equating to machine gun rather than semi-automatic fire. Well, I think afterwards the other witness testified how it sounded, which was similar, rough, and almost in similar manner. Almost in similar manner. It was in similar manner, like rough in a fast succession, I would say from the expert witness. Or from the officer himself who testified in this case. But now you're at the second round. If the officer you're talking about is your expert who said he'd been to the practice range, and based on him hearing at the practice range, unlike all the jurors who we presume have not heard in person a machine gun because they're illegal. That's correct. So then we have this incident, and they drive and they flee, and what do we do? We have this scenario where they leave, and what do they do when they get out of the car? Two of the guns were thrown out onto the ground with some magazines and everything else. And then in the apartment complex, that's where Tanko and Rosario were caught with the other firearm in this case. And there it was found in a laundry basket in the same room that Tanko was at the moment. And then the parts of the firearm were on either side of the, they had thrown the barrel on one side and another part, they had thrown the slide. So in this case, here we have Tanko in possession, in joint possession of the firearm that could have been also in the room, bedroom of the apartment complex that they had arrested him in. We've used up a lot of your time on this machine gun issue, but I know you will also want to address the claim that the confession was not corroborated. And I'm particularly interested in whether you agree that each of the essential facts of the confession do need to be corroborated, and if so, how the corroboration occurred here. Well, I think what you have to look at is, if you look at the totality of the way the case law states it, you have to look at the totality of the confession in itself, in order to prove whether it was reliable, the confession in itself. And here, that's what the government is arguing. So you're saying independent corroboration, other than looking at the confession itself, is not required? Well, no, I'm saying there is some independent corroboration required, because if you look at it, here the person was caught with drugs, he had enough to make two joints that were in his shoe, we have also other independent... Are you saying on the aspect, does it have to be... I think we have a sufficient corroboration with just him with the possession of the drugs, and other... Yeah, I'm sorry, I'm not making it clear. Sorry. There's a statement in the confession, that I was a daily drug user for a long time. Right, for a long period of time, yes. Does the government have a position, first, on whether that statement alone, if that is evidence that we can look at... I think... ...is that evidence alone enough to support the conviction of being a long time drug user? From my understanding of the case law, you need... you look at the totality of circumstances, and some... and whether it's reliable, the statement in itself. The reliability of the statement... The answer of the government is, as to that, independent of any corroborating evidence, what? You do need some independent evidence... Okay, so the government's position is we have to have corroborating evidence here in order for this conviction to be sustained. Correct. Okay, so, then the question is, okay, so that means you treat this as an essential fact for which there needs to be corroborating evidence? That is correct, but you can look at the totality of circumstances, the totality of what was confessed in order to make that determination, whether it was reliable or not. I think you can assume we're always going to look at the totality. Right. We're interested in what is it in this totality that you think should generate an inference that's sufficient to provide the independent corroboration? I think you have to look at, based on his confession, he admitted that, one, he was a daily drug user... Now you're back to the confession. Right, right. Okay, but assume we know, we've got that fully in mind, the confession. I heard you tell Judge Barron that the confession alone is not enough to sustain the conviction here by itself. What is it outside the confession, other than him being found with the two joints worth of marijuana on him, that corroborates the confession? I think you have to look at the seizure of the machine gun, because he had confessed to that as part of it. You're saying lots of pieces of the confession were corroborated? Exactly. Okay, but there's one piece that he confessed to that there's not similar direct corroboration. That's the long-term usage of marijuana, right? Correct. Does the government have a view as to whether that piece separately needs to be corroborated or not? No, I don't think so. Okay, so the government's view is that that needn't be corroborated. Right. Even if there's no evidence outside of it that speaks to the length of the use, the fact that other statements that don't speak to the length of the use were corroborated is enough to make that reliable. Correct. Okay. How do you square that with the precedence that says every essential fact has to be corroborated? Because an essential fact of this crime is the duration of the use, and that essential fact does not seem to be corroborated. Well, again, then we get to the factor of him possessing the drug in itself at the moment, showing he did... Because you just represented we don't need to get to that because the other pieces of the statement that don't relate to the duration of the use were corroborated, therefore we can treat the confession as a whole as corroborated. I understand that argument. Right. It's an important legal argument the government's making to us. Yes. For it to be true, we might have to reject the view of other circuits that don't accept that legal argument. Because they say every essential fact of which duration is an essential fact has to be independently corroborated. What is the government's reason for us to adopt the legal position you're asserting? If you could repeat that again, I'm sorry. You could repeat that again. Yeah. Okay. So you're trying to say if we take the corroboration, as if we don't need corroboration independent of the drugs, is what you're saying in this case. Is that what you're saying, Your Honor? There's different elements of this offense. Correct. One element we both agree is duration of drug use. Correct. Yes. There's a question whether there's outside evidence that corroborates duration. Correct. That's less clear than whether there's outside evidence that corroborates the statement that he uses it. Do you agree with that? That's true. Yes. Okay, great. I heard you to be saying because there is outside evidence that corroborates many aspects of the statement, Yes. we can treat the whole statement as corroborated even though the essential piece of the statement that concerns duration does not have evidence that's as strong for corroborating it. That is correct. I'm going to ask you what is the legal basis for taking that position because some precedent seems to suggest every essential fact, duration being one given that's an element of this offense, has to be separately corroborated. It's not enough that other pieces of the statement were corroborated. Okay, Your Honor. In response to that question, I think what we're reciting to Smith v. United States where evidence corroborated of the admission need not prove offense beyond a reasonable doubt or by preponderance of evidence that the offense had been committed, so long as the evidence as a whole proves beyond a reasonable doubt the defendant is guilty. So I think the Supreme Court even says you can take the whole aspect of it, of what was confessed in this case, versus just taking one tidbit of it, of that thing and saying, okay, it isn't entirely correct, but you take the whole aspect of the confession itself in order to make it. So then if we rejected that position, we'd then be to the question of if we thought the essential facts language and some of the other precedents meant we actually have to have corroborating evidence, not just of the whole, but of the particular piece concerning duration. Correct. What evidence is there in the government's view that would permit the government to win and have the conviction upheld as to duration? Gosh, other than possession of the drugs with two joints that he possess at the moment, that's the only evidence that we have direct evidence proving. Does that prove duration? That he smoked joints? No, Your Honor, I would not say so in this case. In this case. Now, I would like to note that when they're asking about the sentencing aspect, he does admit, if you look at the pre-sentence report, he does admit at the bail hearing that he smoked daily. But that's that sentencing. No, Your Honor, when the counsel was bringing up about sentencing and other issues and the judge was requesting it, does admit that he'd smoked since he was 18 marijuana daily, at six joints a day daily. He admitted at the bail hearing and that was part of the pre-sentence report in this case. Oh, so that goes to the guidelines factor. Exactly. Okay, I got it. Just to correct that so you understand that there was evidence on the record and they didn't object to that, to the PSR, to that aspect where he made that admission at the bail hearing. Regardless of whether count one is in or out, that guideline still applies, is what you're saying. Exactly. Any other questions? Thank you. Thank you. Ms. Marantini. Yes, Your Honor. I wanted to address Your Honor's questions regarding whether the Supreme Court's corroboration doctrine applies to the essential facts. And there are cases that we cited in our brief that show that the essential facts of the confession, those facts that are essential for the elements of the offense do have to be corroborated. So we can't have a case where, for example, the aspect of Mr. Cepeda's confession dealing with possession of a firearm is corroborated. And so that makes the confession as a whole sufficiently trustworthy. In Sperling, in the Fourth Circuit's decision in Sperling. Why would that? Tell me about the logic of that. If the far greater offense, the confession is reliable and corroborated, why do we have to go to the elements of the other offenses? Because that's what author states that the essential facts have to be corroborated. Now you're just citing precedent, but I think the question is logically, given why we have this rule, we're concerned about certain things. We're concerned about someone admitting something they didn't do. We're concerned about officers falsifying a convention, which here we don't have a recorded one. So we require some corroboration. And I think the question to you is just as a matter of logic. If we can corroborate that the major components, the most inculpatory components, the most heinous components of the crime were in fact all corroborated, why would we be worried about the possibility, which now would seem very small, that some minor element was itself falsified? Well, I wouldn't consider the drug user prong to be a minor element because it is the element that is essential to making that offense a federal offense. Sure, but the officers don't know that. The defendant doesn't know that. But they sure as heck know that gunning down a guy with a machine gun is a big deal. Yes, Your Honor. Well, I think the way that other circuits have interpreted OPER makes it clear that those essential facts, in addition to the possession, for example, have to be corroborated. That's exactly why Sperling vacated the conviction. That's why in the United States v. Jackson. This also happens to be an element that's particularly hard to corroborate from the facts of the offense. I wouldn't necessarily. If he confesses to the shootout, the fact that there was a shootout is going to provide some corroboration of that. If I confess to I was a long-term drug user in the course of the shootout, the shootout is not going to corroborate that. So that would give you a reason to be concerned about using a confession to prove an essential fact like this one, when it's going to be hard to have it be corroborated by much other than the confession, unless you go out and get the kind of stuff you were talking about, drug tests and the like. Right, Your Honor. And it's analogous to if he had been charged with being a felon in possession, they obviously would have gone and assured that there was evidence that he was a felon, which is what makes that offense federal. When the person is arrested and is not a felon or has some other hook for federal jurisdiction, it is very common in Puerto Rico for the agents to then begin asking the person about their drug use. The problem is that there's never any evidence to support what the person is saying, and so they're pigeonholing federal jurisdiction based on these admissions that the person has been using marijuana for a certain period of time. The Fourth Circuit has repeatedly found convictions to be insufficiently corroborated where there is a dearth of evidence as to a particular aspect of that confession, and it's particularly material in this case. I think it's clear that more would be required. Thank you.